UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | M.J. Nos. | 24-7150-JCB |
| OF THE UNITED STATES OF AMERICA | ) | | 24-7151-JCB |
| FOR A CRIMINAL COMPLAINT | ) | | 24-7152-JCB |
| CHARGING JASON HUNTER AND | ) | | |
| WALTER NORTON WITH A VIOLATION | ) | | |
| OF 21 U.S.C. § 846 | ) | | |
| | ) | | |
| IN THE MATTER OF AN APPLICATION OF | ) | | |
| THE UNITED STATES OF AMERICA FOR A | ) | | |
| SEARCH WARRANT FOR 354 REVERE | ) | | |
| STREET, APARTMENT 2, REVERE, | ) | | |
| MASSACHUSETTS 02151 AND CELLULAR | ) | | |
| TELEPHONES LOCATED THEREIN | ) | | |
| | ) | | |
| IN THE MATTER OF AN APPLICATION OF | ) | | |
| THE UNITED STATES OF AMERICA FOR A | ) | | |
| SEARCH WARRANT FOR A BLUE HONDA | ) | | |
| CR-V WITH NEW HAMPSHIRE | ) | | |
| REGISTRATION 487 1968 PARKED IN THE | ) | | |
| DRIVEWAY OF 354 REVERE STREET, | ) | | |
| REVERE, MASSACHUSETTS | ) | | |

AFFIDAVIT IN SUPPORT OF APPLICATIONS

I, Special Agent Ryan P. Glynn, being duly sworn, depose and state that:

INTRODUCTION

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant.

2.      I have been employed as a Special Agent with the Drug Enforcement

Administration ("DEA") since 2015.  I currently am assigned to the Financial Investigations Team

of the New England Field Division in Boston, Massachusetts, where I have been assigned since April 2021.

3.     As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received significant training in the field of narcotic investigations and enforcement. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

4.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.     Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use

of electronic surveillance.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

PURPOSE OF AFFIDAVIT

6.      I submit this affidavit in support of a Criminal Complaint charging Jason HUNTER and Walter NORTON with conspiracy to possess with intent to distribute and to distribute methamphetamine and marijuana, in violation of Title 21, United States Code, Section 846.

7.      I also submit this affidavit in support of applications for search warrants for the following locations:

a.    354 Revere Street, Apartment 2, Revere, Massachusetts 02151 and certain cellular telephones located therein (the "Target Location").  354 Revere Street is a two-story, two-family residence clad in tan-colored clapboard siding.  The residence has white trim.  The front door is dark in color, with a white and glass storm door.  The front door, which is accessed via stairs with a black iron handrail, is marked with brass numbers "354" and with white letters and number "APT 1."  Apartment 2 is accessed via a side door to the residence.  The side door is located on the right side of the property when viewing the residence from Revere Street.  The side door is white, with a white and glass storm door, and is marked to the right of the door with black and gold letters and number "APT 2."  The door to Apartment 2 is accessed via wood stairs, and there is a black mailbox marked with the number 2.  A full description and photographs of the Target Location are attached hereto as Attachment A, which is incorporated herein by reference.

b.    A blue Honda CR-V with New Hampshire registration 487 1968 parked in the driveway

of 354 Revere Street, Revere, Massachusetts (the "Target Vehicle").

8.       As part of my duties, I am currently participating in an investigation into the criminal activity of Jason HUNTER and his associates.  I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the DEA and other federal, state, and local law enforcement agencies.  I have also reviewed information from a variety of additional sources, including telephone records, responses to administrative subpoenas, undercover pickups of drug proceeds, a seizure of drug proceeds, and a seizure of methamphetamine and marijuana.  For the reason set forth herein I believe there is probable cause to believe that HUNTER has committed violations of Title 21 United States Code, Section 846 (conspiracy to distribute controlled substances) and Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering).  I further believe there is probable cause to believe that evidence of drug trafficking and money laundering offenses in violation of Title 21 United States Code, Section 846 and Title 18, United States Code, Section 1956(h) will be located in the Target Location and the Target Vehicle.

9.       I further believe, based on the information set forth herein, that there is probable cause to believe that HUNTER and Walter NORTON have violated Title 21 United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute methamphetamine and marijuana).

10.       This Affidavit is submitted for the limited purpose of establishing probable cause to believe that evidence of criminal activity will be located inside the Target Location and on certain cellular telephones located therein, and inside the Target Vehicle, and to establish probable cause for the issuance of the requested Criminal Complaint.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in the investigation.  I

have set forth only the facts that I believe are needed to establish the requisite probable cause.

## BACKGROUND OF INVESTIATION

11.    Agents in Seattle, Washington, and Chicago, Illinois, currently are conducting separate investigations into large-scale international money laundering organizations.  As part of those investigations, a confidential source of information (the "CS")[1] is in contact with money brokers located in Colombia.  In my experience, money brokers act as liaisons between drug suppliers based in Central and/or South America and their drug customers in the United States.  The money brokers facilitate the laundering of drug proceeds from inside the United States to the drug suppliers located outside the United States.  This laundering involves the retrieval of cash drug proceeds from drug distributors in the United States.  The drug proceeds are then deposited into bank accounts within the United States and transferred to accounts specified by the money broker offering the contract or by his associates or converted into crypto currency and transferred to crypto wallets specified by the money broker offering the contract.  Ultimately, the money broker pays out a corresponding sum of money (less a transaction fee) in a local currency or in cryptocurrency to drug suppliers located outside the United States.

12.    The CS receives contracts from money brokers to conduct pickups of drug proceeds in the United States.  Law enforcement agents have conducted controlled pickups in connection with contracts offered by the money brokers in contact the CS in cities throughout the United States, including Boston.  Agents have seized $2 million in drug proceeds and 50 kilograms of cocaine in connection with the pickups contracted in connection with the Chicago investigation

---

[1] Agents in Chicago have received information from the CS since 2015.  The CS is cooperating in exchange for monetary compensation.  The CS has no criminal history.  Information provided by the CS has been corroborated by other evidence and has led to the seizure of drugs and drug proceeds.  Information provided by the CS is believed to be reliable.

and $850,000 in drug proceeds in connection with the Seattle investigation.

13.     HUNTER has delivered drug proceeds to an undercover agent for laundering in connection with the Seattle investigation, and he arranged to deliver drug proceeds to an undercover agent for laundering in connection with the Chicago investigation.  On February 28, 2024, HUNTER delivered $140,000 for laundering that he took from the Target Vehicle.  He entered the Target Location after delivering the money to undercover law enforcement officers.  On April 3, 2024, HUNTER removed a bag containing bundled United States currency from the Target Vehicle.  The currency was seized from HUNTER while he was en route to deliver it for laundering.

14.     As described in more detail below, while agents were surveilling 354 Revere Street in anticipation of the delivery of drug proceeds to undercover agents on April 3, 2024, agents observed NORTON arrive at the Target Location.  After NORTON left the Target Location, police attempted to stop his vehicle.  NORTON discarded methamphetamine pills from his car while fleeing from police, and police subsequently seized marijuana from a bag that NORTON had carried out of the Target Location.

EVIDENCE IN SUPPORT OF PROBABLE CAUSE

February 28, 2024 Pickup of $140,000 in Drug Proceeds from HUNTER

15.     On February 27, 2024, a Seattle-based agent with the DEA contacted agents in Boston and stated that an unidentified male in the Boston area wanted to deliver $100,000 in drug proceeds for laundering.   Boston-based agents provided the serial number for a $1 bill (G08356270F) and the verbal code "looking for Primo on behalf of Andres" to be used as a confirmation code at the time of the money pickup.  I am aware, based on my training and experience, that the use of such serial number confirmation codes and verbal codes is common

among drug traffickers and money launderers as a means to ensure that cash drug proceeds are provided to the correct people when the parties to a transaction are not personally known to one another.   Boston-based agents also provided a telephone number for an undercover law enforcement officer posing as an associate of the CS ("UC-1").   The CS passed the information to the money broker offering the contract.

16.     That day, UC-1 received a WhatsApp message from telephone number 372-5831-4609, which is an Estonia-based telephone number, indicating that the user (hereinafter, "UM4609") was messaging regarding the Boston pickup and providing the verbal code "Jaime on behalf of Primo Andres."   Shortly thereafter, UC-1 missed a WhatsApp call from UM4609.   UC-1 messaged UM4609 that he would call UM4609 back.   Approximately twenty minutes later, UC-1 called UM4609 via WhatsApp.   UC-1 noted that UM4609 spoke with a Colombian accent. UM4609 stated that he preferred to message rather than speak over the phone, as he provided his associates with copies of the messages. UC-1 agreed and asked if UM4609 would be sending a worker to the pickup.   UM4609 confirmed and stated that he would be coordinating the pickup. UC-1 asked for the amount, and UM4609 replied, "140," referring to $140,000.   UC-1 asked if UM4609 was ready for the pickup, and UM4609 affirmed.   UC-1 inquired as to where UM4609's worker was located, and UM4609 replied that he was in the area of Revere.   UC-1 stated that he would make the arrangements.

17.     Later that day, UM4609 sent a WhatsApp message with the last four digits of the serial number confirmation code and asked UC-1 to confirm the first four digits of the code.   UC-1 replied with the requested information, and UC-1 and UM4609 then made arrangements via WhatsApp message to conduct the pickup the following day in Revere.

18.     On the morning of February 28, 2024, UC-1 and UM4609 confirmed the pickup

for that day.  UM4609 messaged that he would send UC-1 the address of the pickup at 11:00 that

morning.  At 11:04 a.m., UC-1 received a WhatsApp message from UM4609 with an address of

12 Thorndike Street in Revere.  The pickup was to occur at 12:00 p.m.

19.     At 11:25 a.m., agents established surveillance in the area of 12 Thorndike Street,

Revere.  At approximately 11:55 a.m., agents observed HUNTER in the area of 354 Revere Street,

where the Target Location is located.  An investigator observed HUNTER enter the Target Vehicle

and position the Target Vehicle in the driveway of 354 Revere Street, which faces Thorndike

Street, so that he could observe Thorndike Street through the windshield of the Target Vehicle.  At

12:03 p.m., UC-1 sent UM4609 a WhatsApp message stating that he would arrive at the meeting

location in about five minutes.  UM4609 replied that his worker was at the meeting location.

20.     Shortly thereafter, UC-1 arrived in the area of 12 Thorndike Street accompanied by

another undercover law enforcement officer ("UC-2").  At 12:07 p.m., UC-1 called UM4609 via

WhatsApp and reported that he had arrived.  UM4609 stated that his associate was in an blue

Honda CR-V.  At approximately 12:09 p.m., HUNTER exited the Target Vehicle carrying a black

shopping bag.  HUNTER waved to UC-1, and UC-1 told HUNTER to get into the car.  HUNTER

then entered the rear passenger compartment of the undercover vehicle.  UC-1 opened the black

bag HUNTER was carrying and observed that it contained bundled currency.  UC-1 asked

HUNTER how much was inside the bag, and HUNTER said, "140."  UC-1 asked if each bundle

consisted of "10s," and HUNTER said, "Yup, by 10."  UC-1 asked if HUNTER had used a money

counter, and HUNTER stated that he had counted the money by hand.  HUNTER asked for the

"token," and UC-1 showed HUNTER a photograph of the dollar bill serial number confirmation

code.  HUNTER took a photograph of the number with his cellphone.  While with HUNTER, UC-

1 called UM4609 and reported that he had the "package."  UM4609 requested the "token," and

UC-1 stated that HUNTER had a photograph.  UM4609 asked that UC-1 message him to confirm the transaction was complete.  Thereafter, HUNTER exited the undercover vehicle and walked back to 354 Revere Street, where he entered the door to the Target Location.  The interaction between HUNTER and UC-1 was audio- and video-recorded.

21.    The bag that HUNTER delivered to UC-1 contained $140,000.  The money, less a commission, ultimately was converted to cryptocurrency and transferred to crypto wallets specified by the broker who offered the contract.

Seizure of Methamphetamine, Marijuana, and $100,000 on April 3, 2024

22.    On April 2, 2024, a Chicago-based DEA agent contacted Boston-based agents and requested assistance with a $85,000 money pickup in Boston.  Boston-based agents provided a serial number for a $1 bill to be used as a confirmation code, the verbal code "looking for Pedro," and the telephone number for an undercover law enforcement officer ("UC-3").  The CS passed this information to the money broker who was offering the contract for the pickup.

23.    That day, UC-3 received a WhatsApp message from UM4609 during which UM4609 confirmed the verbal code "on behalf of Pedro."  UM4609 then messaged that he had a "token" for Boston.  UC-3 acknowledged the code, and UM4609 then provided the last four digits of the dollar bill serial number confirmation code and requested that UC-3 provide the first four digits, which UC-3 did.  UM4609 then provided the entire serial number and sent a series of messages stating that the pickup would be for "100K USD" and would be from an associate in Revere.  Initially, UM4609 proposed conducting the pickup on the evening of April 2, 2024, but ultimately, he agreed to do the pickup on April 3, 2024, at 12:00 p.m.

24.    At 9:24 a.m. on April 3, 2024, UC-3 contacted UM4609 via WhatsApp message to confirm the pickup, and UM4609 replied that he would provide an address at 11:30 a.m.

25.     Agents began surveilling 354 Revere Street at approximately 8:40 a.m. that morning.  Agents observed the Target Vehicle parked in the driveway of the residence at that time. At approximately 9:37 a.m., agents observed HUNTER exit the Target Location.  He walked to the back of the residence, where the driveway is located, but based on agents' vantage points, they could not see whether he accessed the Target Vehicle.  After two minutes, HUNTER returned to the door to the Target Location.  He remained outside the door, where he smoked a cigarette before reentering the Target Location.

26.     At approximately 10:10 a.m., an unidentified female with a baby arrived at 354 Revere Street and entered the Target Location.  At approximately 11:45 a.m., the female and baby left the Target Location.

27.     At approximately 10:56 a.m., agents observed a male subsequently identified as NORTON arrive in a grey Chevrolet Blazer with New Hampshire registration 524 0365 and park in the driveway of 354 Revere Street, nose-to-nose with the Target Vehicle.  NORTON exited the Blazer, removed a grey duffel bag from the rear driver's side door, and entered the Target Location carrying the duffel bag.  At that time, NORTON appeared relaxed.  At approximately 11:15 a.m., agents observed NORTON exit the Target Location again carrying the duffel bag.  At this time, NORTON appeared more anxious; he was looking around as if concerned about his surroundings and was moving quickly and with purpose.  NORTON walked to the Blazer and placed the duffel bag in the rear cargo compartment of the car.  NORTON then walked empty-handed down the driveway towards the Target Vehicle, out of sight of investigators for approximately twenty seconds.  After approximately twenty seconds, NORTON came back into view, though investigators were not able to see his hands.  NORTON entered the driver's seat of the Blazer. After entering the driver's seat, NORTON placed an item into the front passenger seat of the

Blazer.  NORTON then pulled out of the driveway and drove away from 354 Revere Street. Investigators maintained constant surveillance of NORTON after he left 354 Revere Street.

28.     NORTON stopped briefly at a Petco store on Squire Road in Revere, where he purchased an item.  He did meet with anyone prior to reentering his vehicle.  After NORTON left the Petco, he was again surveilled by investigators until a Massachusetts State Trooper initiated a traffic stop of NORTON on 95 southbound in Lynnfield, Massachusetts, at my direction. NORTON did not stop for the Trooper; instead, he cut across several lanes of traffic, hitting another car.  At that time, NORTON exited the Blazer with a brown nylon drawstring bag and attempted to flee on foot.  While running, NORTON threw the bag, which was recovered by police. NORTON was apprehended and placed in custody.  The bag contained approximately 4.5 kilograms of orange pills bearing Adderall markings that field tested positive for fentanyl or methamphetamine.  Based on my training and experience, I am aware that orange pills bearing Adderall markings commonly contain methamphetamine, and for that reason, I believe that the pills discarded by NORTON contain methamphetamine.  I further believe, based on the fact that NORTON approached the Target Vehicle prior to entering the Blazer and that he appeared to put an item on the front passenger seat of the Blazer after entering the car, that there is probable cause to believe that NORTON retrieved the pills from the Target Vehicle.

29.     Agents subsequently searched the Blazer.  Agents located the grey duffel bag in the cargo area of the Blazer.  Inside the grey duffel bag, agents located heat-sealed plastic bags of marijuana.  The marijuana weighs approximately two kilograms.  I believe that NORTON obtained the marijuana from HUNTER inside of the Target Location.

30.     Meanwhile, at 11:27 a.m., UC-3 sent UM4609 a WhatsApp message telling him that "his guy" was on his way.  UM4609 acknowledged but did not provide an address.  At 11:49

a.m., UC-3 sent another message to UM4609 requesting a meeting location.  UM4609 replied with an address of 12 Thorndike Street in Revere.  UC-3 acknowledged.  At approximately 11:59 a.m., UC-3 and UC-1 arrived in the area of 23 Thorndike Street.  UC-3 exchanged WhatsApp messages with UM4609 regarding his location and vehicle.

31.     Meanwhile, at 12:05 p.m., agents conducting surveillance outside of 354 Revere Street observed HUNTER exit the Target Location empty-handed and walk out of investigators' view around the back of the house towards the driveway.  Investigators on the other side of the residence observed HUNTER approach the Target Vehicle, which was parked in the driveway of 354 Revere Street, open the rear driver's side door, and remove a black shopping bag from the car. HUNTER then walked down the driveway towards Thorndike Street carrying the shopping bag.  I approached HUNTER, identified myself as police, and asked him to speak with me.  HUNTER became very aggressive.  I asked him to put down the bag he was carrying, which he did.  I was able to see that the bag, which had an open top, contained bundled currency.  I asked where HUNTER had gotten the bag from.  HUNTER stated that he had retrieved the bag from a red pickup truck parked in the driveway.  When I stated that I had seen him take it from the Target Vehicle, HUNTER replied, "You don't know shit about me."  HUNTER then started yelling, "You'll find out who I am," that he was from a particular neighborhood and that investigators would learn what that meant, and that investigators should get a lawyer for him.  HUNTER ultimately was taken into custody.

32.     The bag that HUNTER was carrying contained ten bundles of banded currency, consistent with the currency that HUNTER delivered to UC-1 on February 28, 2024.  I believe that the bundles contain $100,000 that HUNTER intended to deliver to UC-3 for laundering.

DRUG TRAFFICKERS' USE OF RESIDENCES AND CELLULAR TELEPHONES

33.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

34.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers

often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

35.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residences. Such documents include rental or storage property agreements and receipts.

36.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for drug traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances.  Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences.  Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

37.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am

aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

38.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.  In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

39.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the offenses under investigation. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, I have learned from this and other investigations that records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in money laundering is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, and bills.  These are necessary to prove ownership – even if they are in the

name of a proxy – and they can be helpful when attempting to evade police.

40.     Based on training and experience, I know that most drug traffickers regularly use cellular telephones to communicate about their drug trafficking and money laundering activities with customers, couriers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug traffickers typically keep the phones in close proximity.  Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in residences maintained by them. As a result, it is common to recover not only paper records pertaining to the use of the cellular phone by drug traffickers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from residences maintained by drug traffickers.

41.     Finally, as noted above, evidence of drug traffickers' crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B-1 on their cellular telephones.

42.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  As with most

electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.  Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

43.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

44.    I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the target of this investigation.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

   a.  controlled substances;

   b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents;

   c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

   d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

   e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income,

including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.   documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.   cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers,

call forwarding information, messages drafted but not sent, and voice

messages;

h.   firearms and other dangerous weapons; and,

i.   identification evidence and/or indicia, such as cell phones with particular

numbers, mail, deeds, leases, rental agreements, photographs, bills, and

identification documents, that tend to identify the person(s) in residence,

occupancy, control, or ownership of subject premises and/or subject

communication devices.

45.     Based on all of the information I have obtained during the course of this

investigation, and for the reasons more specifically set forth herein, I believe that HUNTER is

engaged in drug trafficking and money laundering. I believe that he is utilizing the Target

Location and the Target Vehicle in furtherance of his criminal activity, and that evidence of his

drug trafficking and money laundering activity will be found inside the Target Location and on

cellular telephones seized therefrom and inside the Target Vehicle.

CONCLUSION

46.     Based on the foregoing, I believe there is probable cause to believe that on or

about April 3, 2024, HUNTER and NORTON did conspire to possess with intent to distribute

and to distribute methamphetamine and marijuana, in violation of Title 21, United States Code,

Section 846.

47.     I further believe there is probable cause to believe that the Target Location and

cellular telephones recovered therefrom and the Target Vehicle presently contain the items set

forth in Attachments B-1 and B-2 hereto, which are incorporated herein by reference, and that

those items constitute evidence of the commission of criminal offenses, contraband, the fruits of

crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1956(h). Accordingly, I respectfully request the Court issue search warrants for the Target Location and the Target Vehicle.

_____

Ryan P. Glynn
Special Agent, DEA

Sworn by telephone in accordance with Fed. R. Crim. Pr. 4.1 this 3rd day of April 2024.

_____

HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

**ATTACHMENT A**

(Location to be Searched)

354 Revere Street, Apartment 2, Revere, Massachusetts 02151 and certain cellular

telephones located therein. 354 Revere Street is a two-story, two-family residence clad in tan-

colored clapboard siding. The residence has white trim. The front door is dark in color, with a

white and glass storm door. The front door, which is accessed via stairs with a black iron

handrail, is marked with brass numbers "354" and with white letters and number "APT 1."

Apartment 2 is accessed via a side door to the residence. The side door is located on the right

side of the property when viewing the residence from Revere Street. The side door is white, with

a white and glass storm door, and is marked to the right of the door with black and gold letters

and number "APT 2." The door to Apartment 2 is accessed via wood stairs, and there is a black

mailbox marked with the number 2. The Target Location is depicted in the photograph below.







**ATTACHMENT B-1**

(Items to be Seized)

All records from January 1, 2023, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to distribute controlled substances), and Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering), including:

1. Controlled substances.

2. Paraphernalia for the packaging or processing of controlled substances for distribution.

3. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances and the laundering of drug proceeds, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

4. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys, and items commonly maintained in vehicles, such as registration, insurance, and identification documents.

5. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8. Cellular telephones in the possession of or used by Jason HUNTER, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or

referencing individuals engaged in drug trafficking or money laundering, located in the memory of any mobile telephone, including but not limited to:

    a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking and/or money laundering;

    b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking and/or money laundering;

    d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking and/or money laundering, or individuals engaged in drug trafficking and/or money laundering;

    e. GPS data;

    f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking, money laundering, or individuals engaged in drug trafficking or money laundering;

    g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking, money laundering, or individuals engaged in drug trafficking or money laundering;

    h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

    i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**ATTACHMENT B-2**

(Items to be Seized)

All tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to distribute controlled substances), and Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering), including:

1. Controlled substances.

2. Cash, currency, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.

3. Documents or tangible evidence reflecting dominion, ownership, and/or control over any tangible assets such as motor vehicles, real property, and commercial storage facilities.